# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

STEPHANIE GADDIS,                )
                                 )
    Plaintiff,               )
                                 )
v.                               )    Case No.: 1:16-cv-01881-SGC
                                 )
ALABAMA INSTITUTE FOR THE        )
DEAF AND BLIND, et al.,          )
                                 )
    Defendants.              )

## <u>MEMORANDUM OPINION</u>[1]

This matter is before the court on the motions for summary judgment filed by Defendants, Alabama Institute for the Deaf and Blind ("AIDB"), John Mascia, and Christy Atkinson. (Docs. 44, 46). These motions are fully briefed and ripe for adjudication. (Docs. 45, 47-52, 54F-55). Also pending is Mascia and Atkinson's motion to strike certain evidence on which Plaintiff, Stephanie Gaddis, relies; Plaintiff has not responded to this motion. (Doc. 53). As explained below, the motion to strike is due to be granted in part, and the motions for summary judgement are due to be granted in their entirety.

## I. PROCEDURAL HISTORY

The operative complaint is the third amended complaint. (Doc. 37). Plaintiff asserts three claims against Defendants. Count I alleges disparate

---

[1] The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 15).

treatment under Title VII and 42 U.S.C. § 1983.  (*Id.* at 13-15).  Count II alleges retaliation and also invokes Title VII and § 1983.  (*Id.* at 15-18).  Count III is entitled "Retaliation and Hostile Work Environment."  (*Id.* at 18-21).

All claims are asserted against AIDB, as well as Mascia and Atkinson in their individual and official capacities.  Accordingly, one group of attorneys represents AIDB and Mascia in his official capacity.  (*See* Doc. 46).  Separate counsel represents Mascia and Atkinson with regard to the remaining claims.  (*See* Doc. 44).[2]  Plaintiff responded separately to each motion for summary judgment (Docs. 48, 49) but also filed amended responses (Docs. 50, 51).  The amended responses attach fewer exhibits, but the substance of the briefs appear to be the same, save the amended response to Mascia and Atkinson's motion; Plaintiff's amended response omits the final page of her brief.  (*Compare* Doc. 48 *with* Doc. 50).  In any event, the undersigned assumes Plaintiff intended the amended responses to supplant her original responses, and this opinion analyzes the arguments and evidence presented in Plaintiff's amended responses.

## II.    STANDARD OF REVIEW

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[2] The motions for summary judgment rely on the same evidence, and Defendants have submitted a joint evidentiary submission.  (Doc. 43).

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## III. FACTS

AIDB is the official state agency designated to conduct educational and training programs for deaf, hearing impaired, blind, and visually handicapped

Alabamians. ALA. CODE § 21-1-23; *see Tuck v. Alabama Inst. for Deaf & Blind*, No. 17-0394-ACA, 2019 WL 398702, at *1 (N.D. Ala. Jan. 31, 2019). AIDB runs the Helen Keller School ("HKS"), which teaches deaf, blind, and multi-handicapped students. (*See* Doc. 47 at 2). AIDB has employed Plaintiff, an African American female, as a teacher for over thirty years. (Doc. 51 at 2; Doc. 37 at 5). For almost all of that time, Plaintiff taught at HKS, where she continues to teach. (Doc. 51 at 2; Doc. 43-1 at 4).

Mascia has been employed by AIDB since January 2005, and has served as AIDB's President since January 2013. (Doc. 43-3 at 2). Prior to becoming President, Mascia had no supervisory authority over Plaintiff and was not involved in any decisions affecting her employment. (*Id.*). As President of AIDB, Mascia does not have authority to hire, suspend without pay, or terminate any employee. (*Id.* at 3). Rather, under Alabama law, Mascia's authority is limited to making recommendations to AIDB's Board of Trustees; the Board of Trustees is not bound by those recommendations. (*Id.*). Atkinson was employed by AIDB from July 1, 2011, through August 26, 2015; during this time she served as the Principal of HKS. (Doc. 43-4 at 2). As Principal, Atkinson did not have authority to hire, transfer, promote, or suspend any employee. (*Id.*). Instead, Atkinson's authority was limited to making recommendations on these matters. (*Id.* at 2-3).

On August 19, 2014, Plaintiff was teaching a class in which K.C. was a student. K.C., a white, visually impaired student who suffers from multiple disabilities, was rude and disruptive, and Plaintiff eventually sent her to stand outside the classroom. (*See* Doc. 51 at 8-9; Doc. 47 at 3). When K.C. subsequently disobeyed Plaintiff's instruction to return to the classroom, Plaintiff walked to K.C. and began escorting her toward the classroom. (Doc. 51 at 8-9; Doc. 47 at 3). Plaintiff testified that as she and K.C. were walking side-by-side, K.C. fell to the ground and began to throw a temper tantrum. (Doc. 43-1 at 11). Plaintiff had her arm around K.C. before she fell; Plaintiff testified she tried to catch K.C. to help her back to her feet. (*Id.* at 11-12). When K.C. refused to cooperate, Plaintiff testified she left her alone. (*Id.* at 12). For purposes of summary judgment, this is how the events with K.C. unfolded.

This interaction was witnessed by at least five other AIDB employees. One teacher, Brenda Lee, stated she saw K.C. fall but did not see Plaintiff pull her across the floor. (Doc. 43-2 at 37). The rest of the witnesses had different impressions. One teacher, Carolyn Stamps, saw Plaintiff escorting K.C. to the classroom and witnessed K.C. fall to the floor; Stamps could not say whether K.C. fell or was pushed to the ground. (Doc. 43-3 at 25). Stamps stated Plaintiff pulled K.C. toward the classroom but did not observe the entire interaction because her view of the area was obstructed. (*Id.*; Doc. 43-2 at 35). Katie Trotter, a job coach,

observed K.C. sit down on the floor as Plaintiff was escorting her. (Doc. 43-3 at 22). Trotter stated Plaintiff pulled K.C. by her arm back to the classroom, with K.C. "sliding on her bottom across the floor." (*Id.*). Trotter estimated Plaintiff dragged K.C. across the floor for approximately twenty or thirty feet. (Doc. 43-2 at 32-33). Another teacher, Christine Smith, opined K.C. lost her balance and fell; after the fall, Smith saw Plaintiff pull K.C. back to the classroom by the arm, dragging her across the floor for a distance between twelve and twenty feet. (*Id.* at 28-31; Doc. 43-3 at 24). Holly Hartsfield, a teacher's aide, also stated Plaintiff pulled K.C. across the floor for approximately five to seven feet and into the classroom; Hartsfield heard a loud bang after Plaintiff and K.C. were back in the classroom. (Doc. 43-3 at 23; *see* Doc. 43-2 at 21).

Later that day, Hartsfield spoke with K.C. and observed a red mark on her arm near the elbow. (Doc. 43-3 at 23). K.C. told Hartsfield that Plaintiff had kicked her in the head during the incident. (*See id.*; *see also* Doc. 43-1 at 21; Doc. 43-2 at 17). Hartsfield then took K.C. to the nurse's station and was directed to make a report to the Alabama Department of Human Resources ("DHR"). (Doc. 47 at 4). Multiple agencies responded, and Plaintiff was placed on administrative leave the following day pending an investigation. (*Id.*; Doc. 51 at 11; *see* Doc. 43-3 at 10). During the investigation, Plaintiff refused to meet with AIDB personnel

without her attorney. (Doc. 47 at 5-6; Doc. 51 at 12). Throughout the investigation, Plaintiff denied dragging K.C. across the floor.

AIDB policies prohibit corporal punishment, which is defined as physically punishing a student "by shaking, slapping, grabbing body parts with excessive force, etc." (Doc. 43-1 at 93-94). On October 24, 2014, Mascia wrote Plaintiff a letter memorializing the conclusions of AIDB's investigation. (Doc. 43-3 at 12-13). The letter acknowledged Plaintiff denied pulling K.C. across the floor but concluded her version of events was outweighed by the four witness statements to the contrary. (*Id.* at 12). As a result, Mascia recommended Plaintiff be suspended without pay for ten days. (*Id.* at 13). Plaintiff rejected Mascia's proposed discipline and requested an evidentiary hearing with AIDB's Board of Trustees. (Doc. 43-6 at 3; *see* Doc. 43-1 at 92).

The hearing board was comprised of four members of the Executive Committee of AIDB's Board of Trustees (the "Hearing Board"). The Hearing Board conducted an evidentiary hearing on November 7, 2014. (Doc. 43-2).[3] Plaintiff was represented by counsel at the hearing, presented evidence, and testified she never pulled K.C. across the floor. (*Id.*; *see* Doc. 47 at 7). Plaintiff

---

[3] Each Hearing Board member affirmed their impartiality and that they would decide the case on the evidence. (Doc. 43-2 at 3; *see* Doc. 47 at 7). Plaintiff contends one of the Hearing Board members, Pat Green, failed to disclose his business relationship with K.C. (Doc. 51 at 13). While unclear, it appears Mr. Green operated or had an interest in some sort of enterprise referred to as "the arena." (Doc. 43-1 at 55). Apparently, K.C. worked at the arena, as did other HKS students. (*Id.*).

also called Brenda Lee, who testified she witnessed K.C. fall but did not see Plaintiff pull her across the floor. (Doc. 43-2 at 37). The Hearing Board also heard the other witnesses—Stamps, Smith, Trotter, and Hartsfield—testify they saw Plaintiff pull K.C. across the floor after she fell. (*Id.* at 20-36). The Hearing Board unanimously voted to approve Mascia's recommended discipline of a ten-day suspension without pay. (*See* Doc. 43-1 at 77). Mascia informed Plaintiff of the Hearing Board's decision later on November 7, 2014. (*Id.*). Plaintiff returned to work at HKS on December 1, 2014. On January 6, 2015, Plaintiff filed an EEOC charge, alleging her suspension without pay was racially motivated and retaliatory. (Doc. 43-7).

Plaintiff contends her suspension was racially discriminatory because white AIDB employees were accused of misconduct but received lesser discipline. (Doc. 51 at 14). Susan McCrary was a white female teacher at HKS who in 2011 was involved in a physical altercation with an African American student in which she pulled the student's hair. (*Id.*; *see* Doc. 43-3 at 5).[4] As a result of this incident, McCrary was arrested and tried for third-degree assault. (Doc. 51 at 14). However, McCrary was not suspended without pay. (*Id.* at 14-15). AIDB's investigation revealed the student attacked and attempted to bite McCrary and that McCrary's actions were taken in self-defense. (Doc. 43-3 at 5-6; Doc. 43-4 at 4-

---

[4] Mascia's predecessor was AIDB's president at the time, and Mascia did not participate in determining whether McCrary should be disciplined. (Doc. 43-3 at 5).

5). The student's parents filed the criminal charges, but McCrary was acquitted after a trial in Talladega Municipal Court. (Doc. 43-3 at 6; Doc. 43-4 at 5). AIDB placed McCrary on paid administrative leave while it conducted the investigation and during the pendency of the criminal charges. (Doc. 43-4 at 4-5). Under the circumstances of that case, AIDB determined McCrary had not violated any of its policies, and she returned to work after her acquittal. (*See id.* at 5).

Hope Marshall, another white teacher at HKS, was accused by a teacher's aide of "abusing" three students in 2013. (Doc. 51 at 16-18; *see* Doc. 43-4 at 6). AIDB placed Marshall on paid administrative leave and reported the allegations to DHR and law enforcement. (Doc. 43-4 at 6). Law enforcement conducted an investigation and found no evidence to support the accusation. (*Id.*). Marshall returned to work without discipline after AIDB concluded she had not violated any applicable policies. (*Id.*).

In 2017, Hope Marshall was again accused of improper treatment of students. (Doc. 47 at 11).[5] AIDB placed Marshall on administrative leave and conducted an investigation, which revealed she applied ankle weights to two students during nap time to control their leg movements. (Doc. 43-3 at 6). Because this violated AIDB's restraint policy, Mascia recommended Marshall be suspended for ten days without pay. (Doc. 55-1 at 2). Marshall rejected Mascia's

---

[5] Atkinson had left employment with AIDB prior to this report, and she did not participate in the investigation or recommend any discipline. (Doc. 43-4 at 7).

proposed discipline and requested a hearing before the Hearing Board. (*Id.*). Prior to the hearing, Marshall negotiated a resolution, agreeing to a two-day suspension without pay. (*Id.* at 3).

Plaintiff also contends she experienced retaliation for filing the January 6, 2015 EEOC charge. (Doc. 51 at 19). These allegations concern Defendants' response to Plaintiff's complaints concerning a disruptive student, the lack of a classroom paraprofessional, failure to purchase a book Plaintiff requested, and Atkinson's response when Plaintiff held a birthday party for a student. (*Id.* at 19-22). Each circumstance is described in turn.

After she filed the EEOC complaint, Plaintiff began experiencing problems with a disruptive student, Z.L. (Doc. 51 at 19-21; *see* Doc. 47 at 11-12). Z.L. directed racial epithets and insults at Plaintiff and other students and threatened to harm and/or kill Plaintiff, other students, HKS staff, Atkinson, and Mascia. (Doc. 51 at 19-21). Plaintiff testified Z.L had been in her class for two or three years. (Doc. 43-1 at 43). Plaintiff reported Z.L.'s behavior to Atkinson and repeatedly requested assistance. (Doc. 51 at 19-21). However, Plaintiff contends: (1) Z.L. was not disciplined, expelled, or moved to another class; and (2) Atkinson failed to provide an AIDB behavioral specialist to assist Plaintiff. (*Id.*).[6] Compounding this

---

[6] Plaintiff cites specific portions of her deposition testimony and the entirety of two exhibits— 29 and 14 pages in length, respectively—to support these contentions. (Doc. 51 at 19-21). The cited testimony does not support the contention Plaintiff was denied access to a behavioral

problem was the February 6, 2015 retirement of Plaintiff's paraprofessional aide. (*Id.*). Plaintiff contends a new paraprofessional aide was not hired until April 2015. (*Id.*). Plaintiff testified Z.L. was not in her class the following academic year because Atkinson removed him from Plaintiff's roster. (Doc. 43-1 at 43).

In response, Defendants have submitted unrebutted evidence that Z.L. was an intellectually disabled student who had an I.Q. below 50 and suffered from multiple disabilities, including Tourette's Syndrome. (Doc. 43-4 at 7-8).[7] Atkinson concluded Z.L.'s behavioral problems and outbursts were attributable to his disabilities. (*Id.* at 8). Additionally, previous suspensions had not affected Z.L.'s disruptive behavior, AIDB did not have an alternative placement for Z.L., and Z.L.'s mother would not approve of additional recommended behavior interventions. (*Id.*). Accordingly, Defendants' disciplinary options for Z.L. were limited under the Disabilities Education Act. (*Id.*). Moreover, Defendants have offered unrebutted evidence that: (1) Wendy Glass, an AIDB Behavior Specialist, was available as a resource to assist Plaintiff with Z.L.'s behavior; and (2) a part-time aide was approved during the absence of a dedicated paraprofessional. (*Id.* at

---

specialist. While the undersigned has not meticulously combed the combined 43 pages of the cited exhibits to find support for this assertion, they do not appear to support it. (Doc. 51-7; Doc. 51-19).

[7] Additionally, Defendants have offered unrebutted testimony that only the AIDB Board of Trustees can remove or expel a student; Atkinson did not have that authority as Principal. (Doc. 43-4 at 7).

9). Plaintiff has not cited any evidence to contest the foregoing averments regarding Wendy Glass or the availability of a part-time aide. (*Id.*).

Regarding the paraprofessional, Defendants have submitted unrebutted evidence that the process of hiring a new paraprofessional—posting an available job, verifying credentials, interviewing applicants, and selecting an applicant— took an average of eight to twelve weeks. (Doc. 43-4 at 8). The approximately ten weeks it took to replace Plaintiff's paraprofessional fell within this time frame. Additionally, Plaintiff testified Z.L.'s behavior did not improve even after a new full-time paraprofessional was assigned. (Doc. 43-1 at 47).

Next, Plaintiff contends she requested Atkinson to purchase a book for her classroom and that Atkinson agreed to do so prior to the incident with K.C. (Doc. 47 at 13). The book cost $165, which would constitute the majority of Plaintiff's yearly classroom supply funds. (*Id.*). At some point Atkinson refused to purchase the book.[8] Defendants have offered unrebutted evidence that Atkinson placed

---

[8] Plaintiff's brief does not describe when Atkinson refused to purchase the book. (Doc. 51 at 21). Instead, as elsewhere, Plaintiff's brief simply recites the same facts in three sequential paragraphs. (*Id.*; *see id.* at 22 (three sequential paragraphs reciting verbatim allegations regarding the birthday party); *id.* at 19-21 (four sequential paragraphs reciting verbatim allegations regarding Z.L.); *id.* at 16 (three sequential paragraphs reciting the same threadbare allegations of disparate treatment verbatim without citing any evidence); *id.* at 14 (two sequential paragraphs reciting allegations concerning Pat Green verbatim); *id.* at 12 (two sequential paragraphs reciting Plaintiff's demand for an Executive Committee hearing verbatim); *see also* Doc. 50 at 14 (three sequential paragraphs reciting the same threadbare allegations of disparate treatment verbatim); *id.* at 15-16 (five non-sequential paragraphs reciting same allegations concerning the birthday party verbatim); *id.* at 17 (three sequential paragraphs reciting same allegations concerning an email verbatim); *id* at 17-18 (two non-sequential paragraphs reciting

purchase orders for copies of the book for Plaintiff and a white teacher who had also requested it. (Doc. 43-4 at 10). After HKS's bookkeeper told Atkinson school funds should not be used for individual teachers due to auditing issues, Atkinson informed Plaintiff and the other teacher she would not purchase copies of the book for their respective classrooms. (*Id.* at 10-11). Instead, Atkinson told both teachers there were two copies of the book in the HKS library, which they could check out and keep in their classrooms. (*Id.* at 11).

Regarding the party, Plaintiff threw a birthday celebration for one of her students on April 2, 2015, inside an HKS academic building. (Doc. 51 at 21). It appears Plaintiff did not get prior permission to have the party. (*See id.*; Doc. 43-1 at 79). Plaintiff brought two deep fryers she owned to prepare food for the party. (*See* Doc. 51 at 21; Doc. 47 at 14). After the party, a staff member asked if she could use the deep fryers; Plaintiff agreed. (Doc. 47 at 14). Later that day another staff member found the deep fryers unattended and confiscated them. (*Id.*). Plaintiff estimates her fryers were not returned for twenty days. (*Id.*).

The day after the party, Atkinson sent Plaintiff an email reminding her that supervisor approval was required for parties on school grounds. (Doc. 43-1 at 79). The email also directed Plaintiff to review AIDB guidelines regarding snacks. (*Id.*). Finally, the email advised Plaintiff she could not throw parties in the future

same allegations concerning Z.L. and paraprofessional verbatim); *id.* at 19-20 (five non-sequential paragraphs reciting same allegations regarding Z.L. and paraprofessional verbatim).

without prior approval. (*Id.*). On the same day, Atkinson sent an email to other staff members including similar reminders that: (1) parties required pre-approval; (2) using deep fryers in the building was unacceptable because they presented a safety hazard—particularly when left unattended—and emitted odors. (*Id.* at 78). Plaintiff did not receive any formal discipline as a result of the birthday party but felt the email and detention of her deep fryers were retaliatory. (Doc. 47 at 14). Plaintiff also testified a white teacher threw a May 19, 2015 party without prior approval. (*Id.* at 15; Doc. 51 at 21-22).[9] Plaintiff further testified Atkinson did not send any emails regarding the May 19, 2015 party; nor did the white teacher receive any warning or discipline. (Doc. 51 at 22; Doc. 47 at 15). Defendants have submitted unrebutted evidence that Atkinson was unaware of the May 19, 2015 party. (Doc. 43-4 at 9).

On October 5, 2015, Plaintiff filed a second EEOC charge, again alleging racial discrimination and retaliation. (Doc. 51 at 22; *see* Doc. 43-8).

## IV.  MOTION TO STRIKE

Counsel for Mascia and Atkinson have filed a motion to strike three exhibits and portions of Plaintiff's responsive brief. (Doc. 53). Plaintiff has not responded to the motion, and the time to do so has expired. (*See* Doc. 17 at 5). The exhibits subject to the motion to strike are: (1) a letter from K.C.'s mother to Atkinson

---

[9] Plaintiff testified she did not know whether the white teacher who gave the party used deep fryers. (Doc. 43-1 at 32).

dated August 19, 2014 (Doc. 50-20); (2) the declaration of Corrie Henderson (Doc. 50-11); and (3) the declaration of Karen Raine (Doc. 50-12). Defendants also move to strike portions of Plaintiff's brief, including: (1) seven paragraphs relying on the foregoing exhibits; (2) one paragraph relying on the foregoing exhibits and Plaintiff's testimony not based on Plaintiff's personal knowledge; and (3) thirty paragraphs which do not cite to any evidence, include hearsay, and/or are not based on personal knowledge. (Doc. 53). As explained below, the motion will be granted in part and denied in part.

### A.  Lack of Citation to the Record

Rule 56(c)(3) provides that a court presented with a motion for summary judgment "need consider only the cited materials, but it may consider other materials in the record." Likewise, the Initial Order governing this case provides: "Citations to the record must refer to the document number and paragraph or line number, where available. If the parties are unable to cite to a specific paragraph or line number, they shall cite the document number and page number." (Doc. 17 at 4). While the court will not strike the portions of Plaintiff's brief that purport to provide factual support without citing to any evidence, any unsupported statements cannot create a genuine issue of material fact where Defendants' have presented evidence to the contrary. *See White v. Alabama Inst. for Deaf & Blind*, No. 16-0190-VEH, 2018 WL 1089879, at *3 (N.D. Ala. Feb. 28, 2018) ("Getting past

summary judgment is very different from getting past the pleading stage. Accordingly, the Court does not give weight to naked allegations of fact that do not have a citation to the evidentiary record."). The factual assertions in the Plaintiff's brief which are not supported by the record do not appear in the facts set out above. The same standard applies to Defendants' briefs.

### B. K.C.'s Mother's Letter to Atkinson

The unsworn letter from K.C.'s mother to Atkinson is dated August 19, 2014, the day of the incident giving rise to Plaintiff's ten-day suspension without pay. (Doc. 50-20). In the letter, K.C.'s mother expresses her support for, and faith in, Plaintiff as a teacher. K.C.'s mother also expresses her belief that K.C. lied about the incident; although not entirely clear, it appears K.C. may have asserted she fell because Plaintiff pushed her to the ground. (*See id.* at 1) ("[K.C.] admitted that she lied about what happened-[Plaintiff] did NOT push her down, she fell after [Plaintiff] grabbed her arm . . . ."). The letter also states that, after K.C. fell to the ground, Plaintiff "took [K.C.] by the arm and dragged her back into the class." (*Id.*).

"[E]vidence inadmissible at trial cannot be used to avoid summary judgment. Even on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge." *Corwin v. Walt Disney Co.,* 475 F.3d 1239, 1249 (11th Cir. 2007) (citations omitted) (affirming grant of

summary judgment for defendant and finding no error in district court's striking testimony not based on personal knowledge).  Hearsay is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.  FED. R. EVID. 801(c).  Hearsay which cannot be reduced to admissible form at trial may not be considered at summary judgment.  *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999).

Because K.C.'s mother was not present during the incident, her letter is not based on personal knowledge and constitutes hearsay which cannot be reduced to admissible form.  Moreover, even if the letter were admissible, it would not help Plaintiff.  To the extent Plaintiff might rely on the letter to show K.C. lied about the incident, the lies the letter describes are limited to K.C.'s apparent earlier assertion Plaintiff pushed her to the ground.  Whether Plaintiff pushed K.C. down is not at issue; for purposes of summary judgment, K.C. either lost her balance or simply sat down.  Similarly, the Hearing Board did not hear any contention that Plaintiff pushed K.C. down; its decision was based on testimony from four witnesses who stated they saw Plaintiff dragging K.C. across the floor after she fell.  Curiously, the letter supports the Hearing Board's conclusion on this point.

For the foregoing reasons, the motion to strike the letter will be granted because it is inadmissible hearsay.  The letter is also irrelevant to the material facts

in this case. Accordingly, the court will not consider the letter or the portions of Plaintiff's brief which rely on the letter.

### C.   <u>Declaration of Karen Raine</u>

Karen Raine was employed as a teacher's aide at HKS at some point; she does not state when she began working, when she ceased working, or when any of the incidents described occurred. (Doc. 50-12). At some point Raine worked in Hope Marshall's classroom for some period of time. (*Id.* at 1). Raine states she observed Hope Marshall's "abusiveness towards students;" she also avers Hope Marshall was reported to DHR "several times." (*Id.*).[10] In utterly conclusory fashion, Raine also opines "AIDB favors white teachers when it comes to investigating incidents of abuse of students." (*Id.* at 2).

Defendants move to strike Raine's declaration because: (1) due to chronology, it could not have been considered by the Hearing Board and thus is irrelevant; and (2) it does not speak to Mascia's or Atkinson's involvement with the investigation or decision regarding Marshall's discipline. (Doc. 53 at 2). Whether the Hearing Board could have considered Raine's declaration does not necessarily render it irrelevant for all purposes. Accordingly, the court will not strike Raine's declaration. However, Raine's statements are so vague, conclusory,

---

[10] The lack of details makes it impossible to determine whether Raine is referring to the 2013 and 2017 reports to DHR discussed above. Raine does not allege she ever reported Hope Marshall to DHR; nor does she state whether anyone ever reported Hope Marshall's conduct to Mascia or Atkinson. Indeed, it is unclear whether Raine's employment overlapped with either Mascia's or Atkinson's.

and lacking in detail as to be useless to rebut properly-supported summary judgment arguments.

### D.    <u>Corrie Henderson's Declaration</u>

Corrie Henderson was an AIDB employee from 1997 to 2011; her declaration describes the 2011 incident which led to Susan McCrary's placement on administrative leave and unsuccessful criminal prosecution. (Doc. 50-11; *see* Doc. 43-3 at 5). Henderson describes the incident as an assault by Susan McCrary. (Doc. 50-11 at 2). Henderson gave this description to AIDB and as a witness in the criminal case. (*Id.* at 3). Henderson states she terminated her employment with AIDB soon after the incident; she was motivated in part by her "refusal to be complicit" in this and other unspecified "policy violations" at AIDB. (*Id.* at 2-3).[11]

Defendants' motion to strike is based on the same arguments it asserted regarding Raine's declaration. As with Raine's declaration, the fact that Henderson's declaration could not have been considered by the Hearing Board does not necessarily render her statements irrelevant. As to the impact of Raine's statements on the merits of this case, Defendants' arguments are well taken. However, the motion to strike will be denied as to Henderson's declaration.

---

[11] Henderson notes she parted ways with AIDB in good standing, with a letter of recommendation from AIDB. (Doc. 50-11 at 3, 5).

### E. Conclusion Regarding Motion to Strike

For all the foregoing reasons, Defendants' motion to strike is **GRANTED IN PART** and **DENIED IN PART**. (Doc. 53). Specifically, the motion is **GRANTED** as to the letter from K.C.'s mother and all statements in Plaintiff's brief which rely on it. The motion to strike is **DENIED** in all other respects.

## V. DISCUSSION

As explained below, summary judgment is due to be granted as to all of Plaintiff's claims.

### A. Claims Against Mascia and Atkinson

The official capacity claims against Atkinson and Mascia are duplicative of Plaintiff's claims against AIDB. As to the individual capacity claims, Atkinson and Mascia are entitled to qualified immunity. Accordingly, there are no genuine issues of material fact, and Mascia and Atkinson are entitled to judgment as a matter of law.

#### 1. Official Capacity Claims

Atkinson and Mascia are entitled to summary judgment on the claims asserted against them in their official capacities. As Defendants argue, the Eleventh Circuit has explained a claim against a state or municipal actor in her official capacity is duplicative of a claim against the municipality or state itself. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Plaintiff

opposes dismissal of the official capacity claims but has not articulated a rationale in response to Mascia's and Atkinson's invocation of *Busby*. (Doc. 50 at 2). Moreover, AIDB—a state defendant—is a party to this case. Accordingly, any official capacity claims against Atkinson and Mascia are effectively claims against AIDB and are duplicative. *See White*, 2018 WL 1089879, at *13–14 (granting summary judgment on official capacity claims under both Title VII and § 1983 on similar rationale). Accordingly, the official capacity claims against Mascia and Atkinson are due to be dismissed.

### 2. Individual Capacity Claims and Qualified Immunity

Among the many meritorious grounds for summary judgment asserted by Mascia and Atkinson is their entitlement to qualified immunity. (Doc. 45 at 31-34). Qualified immunity shelters government officials performing discretionary functions from civil liability, as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To claim qualified immunity, a government official first must prove she was acting within her discretionary authority. *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). To show a particular action was discretionary, a defendant must show: (1) she was "performing a function that, *but for* the alleged constitutional infirmity," was within her legitimate job description; and (2) she was "executing that job-related

function." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004).

"Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358. To do so, the plaintiff must show the defendant's actions violated a clearly-established constitutional right. *Id.* An official is entitled to qualified immunity if she "could have believed" the conduct was lawful. *Hunter v. Bryant*, 502 U.S. 224, 227, (1991). Accordingly, to overcome qualified immunity, a plaintiff must demonstrate that "no reasonably competent" official would have acted as the defendant did. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Here, Atkinson and Mascia claim qualified immunity as to all of Plaintiff's claims. (Doc. 45 at 31-34). Both Mascia and Atkinson aver that at all relevant times they acted within their discretionary authority in performing official duties within their authority. (Doc. 43-3 at 2; Doc. 43-4 at 2). Accordingly, the burden shifts to Plaintiff to show Defendants are not entitled to qualified immunity. *See White*, 2018 WL 1089879, at *13.

In response, Plaintiff cites portions of an Eleventh Circuit opinion relying on the Alabama Supreme Court's analysis in *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000), regarding state-agent immunity for tort claims under Alabama state

law.  (Doc. 50 at 29-30) (citing *Girder v. City of Auburn*, 618 F.3d 1240 (11th Cir. 2010)).  However, as Mascia and Atkinson note in their reply, Plaintiff does not assert any claims under Alabama law in the instant lawsuit.  (*See* Doc. 52 at 6-7). Nor does Plaintiff's response address the relevant qualified immunity inquiry. (Doc. 50 at 29-33).  Plaintiff having effectively failed to address the qualified immunity defense, Mascia and Atkinson are entitled to qualified immunity as to the official capacity claims against them.  *See White*, 2018 WL 1089879, at *13 (granting summary judgment to all claims—including claims under both § 1983 and Title VII—for failure to respond to qualified immunity defense); *Maldonado v. Unnamed Defendant*, 648 F. App'x 939, 955 (11th Cir. 2016).

Additionally, even if Defendants were not entitled to qualified immunity under the foregoing analysis, they would be entitled to qualified immunity as a result of analysis in the remainder of this opinion.  As explained below, Plaintiff has failed to establish a violation of her rights under the Constitution or federal law.  Accordingly, Mascia and Atkinson are entitled to qualified immunity regarding all claims asserted against them in their individual capacities.  *Tuck*, 2019 WL 398702, at *7–8.

## B.  Claims Against AIDB

As explained below, there are no genuine issues of material fact and AIDB is entitled to judgment as a matter of law on all claims asserted.

### 1.    Disparate Treatment

Plaintiff claims AIDB suspended her because of her race in violation of Title VII and § 1983.[12]  Where there is no direct evidence of discrimination, as here, a plaintiff may establish a *prima facie* case of discrimination through circumstantial evidence by proving: (1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *See Holifield,* 115 F.3d 1155, 1562 (11th Cir. 1997) *abrogated on other grounds by Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). Additionally, a plaintiff's would-be comparator must be "similarly situated in all material respects."  *Lewis v. City of Union, Ga.*, 918 F.3d 1213, 1224 (11th Cir. 2019).

Once the plaintiff successfully demonstrates a *prima facie* case, the defendant is required to articulate a legitimate, non-discriminatory reason for its conduct. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). Because the employer must only produce, not prove, a non-discriminatory reason for its action, the employer's burden is "exceedingly light."  *Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995).  "If the employer

---

[12] "The legal elements necessary to prove disparate treatment under both Title VII and § 1983 are identical." *Tuck*, 2019 WL 398702, at *7 (citing *Stallworth v. Shuler*, 777 F.2d 1431, 1334 (11th Cir. 1985)).

satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson*, 376 F.3d at 1087. To show pretext, a plaintiff "must meet the reason proffered head on and rebut it." *Crawford v. City of Fairburn,* 482 F.3d 1305, 1308 (11th Cir. 2007).

Here, Plaintiff belongs to a protected class, was subjected to an adverse employment action, and was qualified to perform her job. Accordingly, the only contested element is whether AIDB treated Plaintiff more harshly than white employees accused of similar misconduct. Plaintiff offers Susan McCrary and Hope Marshall as comparators. (Doc. 51 at 27-28). As Plaintiff would have it, both McCrary and Marshall were white teachers accused of abusing students but receiving less severe discipline. (*Id.*).

Following the 2011 incident involving McCrary and a student, AIDB placed McCrary on leave while it conducted an investigation, just as it did with Plaintiff following the incident with K.C. Unlike Plaintiff, McCrary faced criminal prosecution for the 2011 incident. However, McCrary was acquitted, and the investigation revealed McCrary was acting in self-defense and was attempting to restrain the student, who had attacked and attempted to bite her. Accordingly,

AIDB contends McCrary is not an appropriate comparator because she is not similarly situated to Plaintiff.

The only evidence Plaintiff offers to rebut AIDB's arguments regarding McCrary is the affidavit of Corrie Henderson. (Doc. 50-11 at 2). Henderson avers she saw McCrary point at the student and run toward her while yelling; McCrary then grabbed the student by the hair and attempted to tackle her. (*Id.*). Henderson also states the student struggled in an attempt to free herself from McCrary until Henderson grabbed McCrary's hands to separate the two. (*Id.*). Finally, Henderson states she relayed her version of events to an AIDB employee who stated she was investigating the incident. (*Id.*). This statement does not conflict with AIDB's contention that the student had attacked McCrary and tried to bite her prior to McCrary's actions. More importantly, Plaintiff has not offered any description of other evidence AIDB's investigation as to McCrary revealed, much less whether AIDB believed McCrary was acting in self-defense. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). Accordingly, while AIDB allowed McCrary to return to work without discipline after her acquittal and the conclusion of the investigation, McCrary is not a suitable comparator. *Lewis*, 918 F.3d at 1227.

Regarding Hope Marshall, Plaintiff relies on separate events that occurred in 2013 and 2017. Following reports that Hope Marshall was abusing students in

some fashion in 2013, AIDB placed her on paid administrative leave, just as it did with Plaintiff. Also as it did with Plaintiff, AIDB relayed the allegations to DHR and law enforcement. An investigation found no evidence to support the accusation. Marshall returned to work without discipline after AIDB concluded she had not violated any applicable policies.

The only evidence Plaintiff has offered to contradict the foregoing version of the 2013 events is the fatally vague declaration of Karen Raine. (Doc. 50-12). Raine avers Marshall mistreated a student, S.V., by: (1) turning off the light in the bathroom while S.V. was sitting on the commode; and (2) running toward S.V. to scare him and make him fall down. (*Id.* at 2). S.V. was scared to be left alone with Marshall. (*Id.*). Raine also states: (1) Marshall somehow made an unidentified student react violently when Raine was not present; (2) when Raine returned, the student was crying in the corner with her clothes off; and (3) Marshall convinced the student's parents that her behavior was "out of control." (*Id.*). While Raines accusations are troubling, her declaration does not reveal the dates of her employment, the dates when these events transpired, or whether she ever shared her specific allegations with AIDB or HKS personnel. Indeed, Raine does not allege AIDB was ever aware of the specific events she alleges. Accordingly, Raine's declaration is insufficient to overcome evidence submitted by AIDB

showing Marshall's conduct in 2013 did not violate any AIDB policies; AIDB's evidence is effectively unrebutted.

In 2017, AIDB again received reports Marshall was mistreating students. AIDB placed Marshall on administrative leave and conducted an investigation, just as it did with Plaintiff. AIDB's investigation revealed she had used ankle weights on two students to control their leg movements during nap time. This violated AIDB's policy against restraining students, so Mascia recommended Marshall's suspension for ten days without pay. Marshall rejected Mascia's proposed discipline and requested a hearing before AIDB's Hearing Board. Prior to the hearing, Marshall negotiated a resolution to the dispute, agreeing to a two-day suspension without pay.[13]

The 2017 events involving Marshall do not provide a suitable comparison to the events surrounding Plaintiff's suspension. Marshall's suspension was due to her violation of AIDB's restraint policy, while Plaintiff was suspended because she violated AIDB's corporal punishment policy. *Lewis*, 918 F.3d at 1227. Therefore, Marshall and Plaintiff are not similarly situated in all material respects. *See id.*; *see, e.g., Watkins v. City of Adamsville*, No. 17-00402-RDP, 2019 WL 3429499, at *16 (N.D. Ala. July 30, 2019); *Husk v. City of Talladega, Ala,*, No. 17-01433-ACA, 2019 WL 2578075, at *1 (N.D. Ala. June 24, 2019). Accordingly, Plaintiff

---

[13] Atkinson had left employment with AIDB prior to this report and was not involved in the investigation or any decisions regarding discipline. (Doc. 43-4 at 7).

cannot prove her *prima facie* case, and AIDB is entitled to summary judgment on this claim. *Holifield*, 115 F.3d at 1562.

Alternatively, AIDB has met its burden of showing its legitimate, non-discriminatory reasons for suspending Plaintiff. The Hearing Board heard four witnesses testify Plaintiff dragged or pulled K.C. across the floor. Notwithstanding Plaintiff's and one other witness's testimony to the contrary, the Hearing Board believed the four witnesses and unanimously determined Plaintiff violated AIDB's corporal punishment policy. Moreover, the events described by the four witnesses constitute corporal punishment under AIDB's policy. Accordingly, AIDB has met its burden to show legitimate reasons for Plaintiff's discipline. *See Watson v. Kelley Fleet Servs., LLC,* 430 F. App'x 790, 791 (11th Cir. 2011) (affirming grant of summary judgment for employer and finding violation of workplace violence policy constituted legitimate, non-retaliatory reason for termination); *Parris v. Keystone Food, LLC,* 959 F. Supp. 2d 1291, 1309 (N.D. Ala. 2013) ("In an employee misconduct case such as this one, an employer's honest belief (even if erroneous) that an employee violated a work rule constitutes a legitimate, nondiscriminatory reason for firing an employee.").

While Plaintiff contends she did not violate any AIDB policies with regard to K.C., this does not establish that AIDB's proffered reasons were pretextual and that she was punished because of her race. *See Wilson v. B/E Aerospace, Inc.*, 376

F.3d 1079, 1092 (11th Cir. 2004) (plaintiff's contention she was not insubordinate did not demonstrate resulting termination was discriminatory). Even if AIDB erroneously concluded Plaintiff dragged K.C. across the floor, getting the facts wrong does not establish pretext. *Elrod*, 939 F.2d at 1470 (even assuming employees who reported plaintiff's acts of sexual harassment were "lying through their teeth," the grant of summary judgment for employer was proper because the inquiry "is limited to whether [employer] *believed* that [plaintiff] was guilty . . . and if so, whether this belief was the reason behind" the termination). Accordingly, to the extent Plaintiff may rely on her denial of wrongdoing, this is insufficient to establish pretext.

Plaintiff also contends the hearing violated due process. (Doc. 51 at 30). This argument is based on vague allegations that K.C. was an employee of "the arena," some sort of enterprise in which Pat Green, one of the Hearing Board members, had some sort of interest.[14] Plaintiff assumes Pat Green knew K.C. because she worked at the arena and "he knows the students that come down there." (Doc. 43-1 at 55). Plaintiff does not contest AIDB's assertion that the Hearing Board had the authority to make employment decisions. (*Compare* Doc.

---

[14] Although unclear, Plaintiff may also contend the Hearing Board's failure to review the stricken letter from K.C.'s mother somehow violated due process. (Doc. 51 at 13-14). While this opinion does not consider the letter's factual assertions, neither can the non-admission of the letter during the hearing constitute a due process violation. For whatever the letter is worth, it supported the Hearing Board's contention that Plaintiff dragged K.C. across the floor.

47 at 21-22, *with* Doc. 51).  Accordingly, the only question is Pat Green's bias due to his assumed knowledge that K.C. worked at the arena.

Administrators serving as adjudicators are presumed to be unbiased; the burden of establishing a disqualifying interest lies with the party asserting the bias. *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982).  This presumption of impartiality is bolstered here, where each Hearing Board member affirmed they would decide the case on the merits of the evidence presented.  Plaintiff's assumption that Pat Green knew K.C. is insufficient to overcome the assumption of impartiality.  This insufficiency is compounded by Plaintiff's failure to introduce any evidence regarding K.C.'s role at the arena, what sort of endeavor the arena is, and Pat Green's interest or involvement in the arena.  Contrary to Plaintiff's assertions, the hearing—at which Plaintiff was represented by counsel who cross-examined AIDB's witnesses, presented her own witnesses, and submitted evidence—complied with due process.  To the extent Plaintiff relies on Pat Green's alleged conflict to establish pretext, she fails.

For the foregoing reasons, there are no genuine issues of material fact and AIDB is entitled to judgment as a matter of law on Plaintiff's disparate treatment claim because she cannot make her *prima facie* case.  Alternatively, AIDB has offered legitimate, non-discriminatory reasons for disciplining Plaintiff, and Plaintiff cannot show those reasons are pretext for discrimination.

## 2.    Retaliation

The plaintiff asserts retaliation under Title VII and §1983.[15]    A plaintiff claiming retaliation must show: (1) she engaged in statutorily protected expression; (2) she suffered adverse employment action; and (3) a causal link between the two. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  The Supreme Court has held the challenged employment action must be materially adverse, differentiating "significant from trivial harms."    *White*, 548 U.S. at 67-68.    To qualify as retaliatory, an adverse employment action must be a "serious and material change in the terms, conditions, or privileges of employment."    *Davis v. Town of Lake Park, Fla.,*  245 F.3d 1232, 1239 (11th Cir. 2001) *overruled on other grounds as recognized by Crawford*, 529 F.3d at 974.  Regarding causation, the Supreme Court has observed: "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m).  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).    Temporal proximity between the protected activity and the adverse employment action is relevant to the inquiry but, without more, is not determinative of pretext.  *Dates v. Frank Norton, LLC*, 190 F. Supp. 3d 1037, 1071 (N.D. Ala. 2016) (citing *Jackson*

---

[15] The standard applicable to retaliation claims is identical under either statute.  *Rainey v. Ga. Dep't of Juvenile Justice*, No. 06-1834, 2007 WL 9802325, at *13 (N.D. Ga. Nov. 20, 2007).

*v. Hennessy Auto*, 190 F. App'x 765, 768 (11th Cir. 2006). Where an employer offers legitimate reasons for an employment decision, the employee bears the burden to show the proffered reasons are pretextual. *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1991).

The argument portion of Plaintiff's brief addressing retaliation relies entirely on her assertion that AIDB retaliated against her by assigning her a "lower functioning" class in which Z.L. was a member. (Doc. 51 at 34). However, the fact section of Plaintiff's brief indicates she may allege retaliation on the following additional grounds: (1) Atkinson's refusal to purchase a book for Plaintiff's classroom; (2) the absence of an assigned paraprofessional from February to April 2015; (3) the confiscation of her deep fryers; and (4) Atkinson's email following the birthday party. As explained below, Plaintiff has failed to establish a *prima facie* case of retaliation because none of these events constituted materially adverse employment actions; causation is lacking regarding some of these events as well.[16] Additionally, even if any of these events could constitute retaliatory conduct, Plaintiff has failed to rebut AIDB's legitimate explanations. Each allegedly retaliatory action is discussed in turn.

---

[16] Plaintiff's only argument regarding causation relies on temporal proximity. (Doc. 51 at 34).

a.    Z.L. and Lower Functioning Class

Plaintiff's allegations concerning Z.L. do not constitute an adverse employment action for purposes of retaliation.  Plaintiff alleges AIDB retaliated by refusing to discipline or expel Z.L. and refusing to provide a behavioral specialist. However, AIDB has presented evidence that Z.L. suffered from multiple disabilities—including a profound intellectual disability and Tourette's Syndrome—which caused his behavioral problems.  As a teacher of disabled students, it is difficult to imagine how the facts described by Plaintiff could constitute  a "serious and material change in the terms, conditions, or privileges of employment."  *Davis,* 245 F.3d at 1239.

Moreover, Plaintiff's allegations concerning Z.L. fail to establish causation. Plaintiff testified Z.L. began exhibiting troubling behavior after she filed her EEOC charge.  However, Plaintiff testified Z.L. had been assigned to her class for at least a year or two before she filed her EEOC complaint.  To the extent Plaintiff contends Z.L's placement in her class supports her retaliation claim, simple chronology defeats the argument.  Also, while Plaintiff vaguely alleges she was assigned a "lower functioning" class, her only specific allegations in this regard concern Z.L.'s conduct.  (Doc. 51 at 34-35).[17]  Furthermore, Z.L. was assigned to a

---

[17] Plaintiff's statement of facts is silent regarding her conclusory allegation regarding assignment to a lower functioning class.  Plaintiff has not asserted any facts regarding when the class was

different class the following year. For the foregoing reasons, Plaintiff's allegations concerning Z.L. do not satisfy her *prima facie* burden regarding retaliation.

Even if Plaintiff's allegations concerning Z.L. could satisfy the elements of retaliation, AIDB has offered unrebutted legitimate reasons for its actions. First, AIDB notes its previous discipline of Z.L. had not been effective and that further discipline was not feasible in light of his mother's wishes and the constraints of the Disabilities Education Act. AIBD also notes Wendy Glass, a Behavioral Specialist, was available to assist Plaintiff and it never refused Plaintiff's requests for assistance with Z.L. Plaintiff has not offered any evidence or response to AIDB's legitimate reasons for its actions regarding Z.L., or otherwise shown its reasons to be pretextual.

For the foregoing reasons, events surrounding Z.L. do not constitute retaliation.

b.    Paraprofessional

Plaintiff contends she was without a paraprofessional for approximately ten weeks after her previous paraprofessional retired. Plaintiff does not allege AIDB caused her previous paraprofessional to retire; her claim concerns the amount of time it took to hire a replacement. These events also compounded the problems caused by Z.L.'s conduct. The temporary absence of a paraprofessional dedicated

---

assigned or its impact on her work environment. Her allegations regarding Z.L.'s behavior are insufficient to satisfy Plaintiff's *prima facie* burden regarding retaliation.

to Plaintiff's classroom does not constitute a materially adverse employment action due to Plaintiff's failure to offer evidence concerning any detrimental impact on her working environment, especially in light of her testimony that Z.L.'s bad behavior continued after the new paraprofessional was hired.

Additionally, even if the events surrounding the paraprofessional could constitute an adverse employment action, AIDB has offered unrebutted evidence that: (1) a substitute was available; (2) a behavioral specialist was available; and (3) the ten-week vacancy was within the normal time-frame required to hire a new paraprofessional. Moreover, to the extent Plaintiff contends the absence of a paraprofessional worsened Z.L's behavioral problems, she testified Z.L.'s behavior did not improve once a replacement was hired. Plaintiff has not offered any argument or evidence to rebut AIDB's proffered legitimate explanation of the circumstances and, thus, cannot show pretext.

For the foregoing reasons, the temporary vacancy of the paraprofessional position does not support a retaliation claim.

c.     <u>Book</u>

Plaintiff alleges Atkinson agreed to purchase a $165 book for her classroom at some point prior to the incident with K.C.; at some point after the incident with K.C., Atkinson reneged. In light of the unrebutted evidence that there were two copies of the book in the library, the refusal to purchase the book did not constitute

an adverse employment action to support a retaliation claim. This is especially true in light of Atkinson's offer to allow Plaintiff to keep one of the library's copies in her classroom and—if that arrangement was unacceptable for some unknown reason—the fact that Plaintiff could have allocated her classroom supply funds to purchase her own copy.

Moreover, AIDB has offered unrebutted evidence that Atkinson: (1) rescinded her promise to buy the book on advice from an AIDB bookkeeper; (2) was unaware of Plaintiff's EEOC charge at the time she made the decision; and (3) also refused to purchase a copy of the same book for a white teacher who had made a similar request. Accordingly, even if the refusal to purchase the book could qualify as an adverse employment action, Plaintiff has not demonstrated AIDB's legitimate reasons for the decision were pretext for discrimination.

d.    Deep Fryers

Although unclear, it also appears Plaintiff may contend the confiscation of her personal deep fryers supports her retaliation claim. Confiscation and temporary detention of personal cooking devices was not a "serious and material change in the terms, conditions, or privileges" of Plaintiff's employment as a teacher. *Davis,* 245 F.3d 1232, 1239. Even if it were, causation is lacking because it occurred approximately four months after Plaintiff filed her first EEOC complaint. Finally, Plaintiff has not rebutted AIDB's legitimate explanation that:

(1) an employee removed the unattended deep fryers from a common area where they were left unattended; and (2) they were returned to Plaintiff undamaged. For all of the foregoing reasons, none of the facts concerning Plaintiff's deep fryers support a claim for retaliation.

e.    Email

The day after the party, Atkinson sent Plaintiff an email reiterating that all class parties required pre-approval and referring her to AIDB's guidelines regarding snacks. Plaintiff felt the email was retaliatory but, because she did not receive any formal discipline as a result of the party, it was not an adverse employment action. Indeed, the email is, if anything, a trivial harm which does not give rise to a retaliation claim. *See White*, 548 U.S. at 67-68.

Also on April 2, 2015, Atkinson sent an email to all HKS staff reminding them: (1) preapproval was required for parties; and (2) using deep fryers in the building was not allowed. It appears Plaintiff contends AIDB's explanation is pretextual because a white teacher threw a party without pre-approval on May 19, 2015, but did not receive an email from Atkinson. However, AIDB has submitted unrebutted evidence that Atkinson was unaware of the May 19, 2015 party. For the foregoing reasons, Atkinson's email does not support a claim for retaliation.

f.    Conclusion Regarding Retaliation

For the foregoing reasons, Plaintiff has not carried her *prima facie* burden to sustain a claim for retaliation.   Alternatively, Plaintiff cannot show any of the legitimate reasons proffered by AIDB are pretextual.   Accordingly, there are no genuine issues of material fact, and AIDB is entitled to judgment as a matter of law on the retaliation claim.

3.    **Hostile Work Environment**

A plaintiff asserting a hostile work environment claim must show: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for the hostile environment under a theory of vicarious or direct liability.   *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002);  *Mendoza v. Borden,* 195 F.3d 1238, 1245 (11th Cir. 1999).   Whether harassment was sufficiently severe or pervasive contains both an objective and a subjective component.   *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993).   To be actionable, the behavior must result in both an environment "a reasonable person would find hostile or abusive" and an environment the victim "subjectively perceive[s] . . . to be abusive."   *Id*.

In support of her hostile work environment claim, Plaintiff relies on Z.L.'s classroom behavior, the confiscation of her deep fryers, and Atkinson's email following the birthday party. (Doc. 51 at 35). These conditions are not objectively severe or pervasive, either singly or collectively. To evaluate the objective severity of harassment, courts consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997). The court looks to the totality of the circumstances instead of requiring proof of each factor individually. *Harris*, 510 U.S. at 23. As the Supreme Court has emphasized, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" including "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998) (quoting *Harris,* 510 U.S. at 23).

Even assuming the confiscation of Plaintiff's deep fryers and Atkinson's attendant email could be construed as racial harassment, they were discreet events. As the Supreme Court has explained, "isolated incidents (unless extremely serious)" are not tantamount to a hostile work environment. *Faragher v. City of*

*Boca Raton*, 524 U.S. 775, 788 (1988). Here, neither event was serious, much less "extremely serious." *Id.*; *see Harris*, 510 U.S. at 21 (hostile work environment created only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult"). Objectively, neither event was physically threatening or humiliating. Likewise, neither event would interfere with a reasonable person's job performance. Accordingly, neither the confiscation of the deep fryers nor Atkinson's email were objectively severe or pervasive.

Next, Plaintiff contends Z.L. directed racial epithets and insults at Plaintiff and other students and threatened to harm and/or kill Plaintiff, other students, HKS staff, Atkinson, and Mascia. Although Plaintiff does not allege the duration of Z.L.'s behavior, the undisputed facts reveal it lasted, at most, from sometime after her January 6, 2015 EEOC charge until the end of the school year in May 2015. Neither does Plaintiff allege how often Z.L. used racial epithets or insults, which is the only discernable basis on which Plaintiff contends Z.L.'s behavior was racially motivated. Indeed, the fact that Z.L. made threatening statements against Mascia and Atkinson, both of whom are white, indicates this aspect of his behavior was not racially motivated. (*See* Doc. 37 at 6). Additionally, AIDB has offered the previously-discussed evidence that it's response to Plaintiff's complaints regarding Z.L.'s behavior was unaffected by Plaintiff's race and that its options were limited by parental resistance and governing law. Again, this evidence is unrebutted.

Turning to the objective severity of Z.L.'s behavior, the totality of the circumstances does not support a conclusion that Plaintiff faced objectively severe and pervasive harassment.  As to frequency, Plaintiff has alleged Z.L's conduct occurred an unknown number of times, possibly over a five-month period.  While Plaintiff does not allege specific statements Z.L. made, she states he: (1) directed unknown racial epithets and insults toward Plaintiff and other students; and (2) made threatening statements concerning Plaintiff and the individual defendants.  However, there is no indication Z.L.'s behavior was physically threatening or humiliating; rather, these were offensive utterances.

While the undersigned is unaware of factually analogous cases  from within the Eleventh Circuit, a decision from a district court in Delaware held similar allegations—more severe but of shorter duration than Z.L.'s conduct here—of harassment in the special education context were not objectively severe and pervasive.  *Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467, 480-81 (D. Del. 2007) (special education teacher alleging student sexually harassed her both physically—resulting in criminal charges—and verbally was not subjected to severe and pervasive harassment).  Additionally, given the social context of Plaintiff's role teaching a child with severe intellectual disabilities, a reasonable person in her situation would not have been detrimentally affected by the conduct described.  *See id.*; *Oncale,* 523 U.S. at 81.  As AIDB notes, Plaintiff's

job duties include "classroom management and maintaining discipline and order among her students." (Doc. 43-4 at 8). Under the totality of the circumstances here, Plaintiff has failed to show Z.L.'s conduct created a workplace "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21.

For the foregoing reasons, there are no genuine issues of material fact, and AIDB is entitled to judgment as a matter of law on Plaintiff's hostile work environment claim.

## VI.    CONCLUSION

As noted above, the pending motion to strike is **GRANTED IN PART** and **DENIED IN PART**. (Doc. 53). For all of the foregoing reasons, Defendants' motions for summary judgment are **GRANTED** in their entirety. (Docs. 44, 46). A separate order will be entered.

**DONE** this 13th day of September, 2019.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE